# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| WHITNEY NATIONAL BANK, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-06-1492 |
| | § | |
| MEDICAL PLAZA SURGICAL CENTER | § | |
| L.L.P., *et al.,* | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

Whitney National Bank filed this suit to recover amounts owing under three promissory notes and related guaranty[1] agreements. The notes were executed by the Medical Plaza Surgical Center L.L.P. ("Medical Plaza"), a limited partnership that owned an outpatient surgical center in Houston, Texas. The notes were for a loan that provided working capital and start-up costs for the center. The guaranty agreements were executed by nine individuals who either invested in the partnership and were affiliated with the surgical center or who were involved in managing the surgical center. Three of those guarantors are no longer involved in this suit.[2] The remaining six guarantors are Clifford

---

[1]There is some confusion as to the proper use of "guaranty" as opposed to "guarantee" as a noun and the corresponding verb form. *See* Bryan A. Garner, *A Dictionary of Modern Legal Usage* 394 (2d ed. Oxford University Press 1995). Today, "guarantee" is commonly used as both a verb and noun. (*Id.*). The noun "guaranty" is used almost exclusively in legal writing, and even then generally only in the financial and banking context to mean "a promise to answer for the debt of another." (*Id.*). It is used here because the parties have used it in the documents they signed.

[2]Whitney Bank has settled with David Janowitz and with Michael Mann and dismissed its claims against Benny J. Sanchez after he filed for bankruptcy. (Docket Entry Nos. 34, 35, 58, 59, 61).

1

Kirby and Melinda Andress, who were affiliated with the surgical center's managing partner, LifeCare ASC Management, L.L.C ("LifeCare"), and four doctors affiliated with the surgical center, Richard Crouse, Duy Bui, Jose Guajardo, and Anthony LaMarra. (Docket Entry No. 58). Two of the individual defendants who invested in the limited partnership and signed personal guaranties, Bui and Guajardo, filed counterclaims against Whitney Bank alleging fraud and civil conspiracy. Those counterclaims have been dismissed. (Docket Entry No. 55). Bui and Guajardo's crossclaims against Medical Plaza, LifeCare, Kirby, and Andress remain. (Docket Entry Nos. 28, 30).

Whitney Bank moved for summary judgment on its claims against Medical Plaza and the guarantors. Three of the guarantors – LaMarra, Bui, and Guajardo – responded, raising the defense of mutual mistake. (Docket Entry Nos. 62, 64). Whitney Bank replied. (Docket Entry No. 67). Based on a careful review of the motion, the responses, and reply, the record, the arguments of counsel, and the applicable law, this court finds no disputed fact issue material to Whitney Bank's claims on the notes or guaranties or to the defense of mutual mistake raised by the three guarantors. Whitney Bank's motion for summary judgment is granted. (Docket Entry No. 58). The reasons are set out below.

## I.    Background

On March 30, 2004, Medical Plaza Surgical Center was formed as a Texas limited liability partnership. (Docket Entry No. 58, Ex. A24). The partnership was composed of one managing partner, LifeCare, and seven other partners. (*Id*., Ex. A25). LifeCare did not make an initial capital contribution but received a 15% ownership interest in the partnership. (*Id.*,

2

Ex. A24).  LifeCare's 15% interest was held equally by Clifford Kirby and Melinda Andress. The other seven partners owned the remaining 85% of the partnership.  (*Id.*, Ex. A25).  Each of these seven partners committed to purchasing between two and four units in the partnership at $15,000 per unit.  (*Id.*,  Exs. A24, A25).  According to the ownership list that Medical Plaza  provided to Whitney Bank in June 2004, Sanchez and Crouse committed to purchase four units and had a 17% interest in the partnership; LaMarra and Bui each committed to purchase three units and had a 12.75% interest; Janowitz, Mann and Guajardo each committed to purchase two units and had an 8.5%  interest; and managing partner LifeCare (Kirby and Andress) held the remaining 15% interest.  (*Id.*, Ex. A25).[3]

The three promissory notes from Medical Plaza to Whitney Bank are as follows:

1.      On June 22, 2004, Medical Plaza executed a promissory note payable to Whitney Bank in the principal amount of $500,000, with a maturation date of June 22, 2005. (Docket Entry No. 58, Ex. A at 4).  On January 26, 2005, the parties modified and increased the note to $850,000.  (*Id.*).  The modified note had a maturation date of November 30, 2005. (*Id.*).  On November 30, 2005, the parties again modified the note to increase the amount to $925,000, with a maturation date of February 28, 2006.  (*Id.*, Ex. A at 4; *Id.*, Ex. A1).

---

[3]The copy of the partnership agreement Kirby provided Whitney Bank in June 2004 with the ownership list provides a slightly different summary of the number of units that each partner committed to purchase.  The partnership agreement lists Janowitz as committed to purchasing three  units rather than two and does not list Mann as purchasing any units.  (Docket Entry No. 58, Ex. A24).  There is no dispute, however, that Mann owned a partnership interest in Medical Plaza.  Indeed, the partnership and subscription agreements attached as exhibits to defendant LaMarra's response to the plaintiff's motion for summary judgment both show the same ownership breakdown as the ownership list Kirby provided to Whitney Bank in June 2004.  (Docket Entry No. 63, Exs. B, C).

2.      On June 22, 2004, Medical Plaza executed a second promissory note payable to Whitney Bank in the principal amount of $410,000, with a maturation date of June 22, 2005.  (Docket Entry No. 58, Ex. A at 4).  On November 30, 2005, the parties modified and decreased the principal amount of the second note to $370,952.38, with a maturation date of February 28, 2006.  (*Id*., Ex. A at 4; *Id*., Ex. A2).

3.      On December 15, 2005, Medical Plaza executed a third promissory note payable to Whitney Bank in the principal amount of $100,000.  (Docket Entry No. 58, Ex. A at 5; *Id*., Ex. A3).  The note matured on February 28, 2006.  (*Id.*, Ex. A at 5; *Id*., Ex. A3)

The notes totaled approximately $1.4 million.  They are unpaid.

The Medical Plaza managers and doctors signed guaranties for 150% of Medical Plaza's debt to Whitney Bank.  (Docket Entry No. 58, Ex. A at 5).  All nine doctors and managers guaranteed[4] the first two notes.  (*Id*.).  The managers, Kirby and Andress, each guaranteed 150% of LifeCare's 15% interest in Medical Plaza.  (*Id*.).  The seven doctors each guaranteed up to a certain dollar amount, calculated as 150% of their respective ownership interests in Medical Plaza shown in the ownership list provided to Whitney Bank in June

---

[4]The words "guarantee" and "guaranty"  may both correctly be used as verbs, with  their respective past tenses being "guaranteed" and "guarantied."  *Webster's Ninth New Collegiate Dictionary* 540 (Merriam-Webster Inc. 1990).  However, the use of "guaranty" as a verb is somewhat dated, and it is generally considered obsolete as a variant of "guarantee."  Bryan A. Garner, *A Dictionary of Modern Legal Usage* 394 (2d ed. Oxford University Press 1995).

2004.  (*Id.*).  The guaranties for the first two notes, except for those signed by LaMarra,[5]

stated:

> AMOUNT OF GUARANTY.  The principal amount of this Guaranty is [X]% of all amounts due now or later from the Borrower to Lender as provided below, however in no event to exceed [Y] Dollars ($[Y]).

(Docket Entry No. 58, Exs. A4-13).  For each guaranty, the X percent is the ownership

interest shown for each  investor in the June 2004 ownership list provided to Whitney Bank.

The Y amount is the maximum dollar amount of each guaranty, which was based on 150%

of each guarantor's ownership interest as stated in the June 2004 ownership list.  Sanchez and

Crouse each owned a 17% interest and guaranteed up to $330,467.87; LaMarra and Bui each

owned a 12.75% interest and guaranteed up to $247,850.90;  Janowitz, Mann and Guajardo

each had an 8.5% interest and guaranteed up to $165,233.94; and Kirby and Andress each

guaranteed up to $291,589.29, an amount corresponding to LifeCare's 15% interest.  (Docket

Entry No. 58, Exs. A4-13).

All the partners except LaMarra and Mann guaranteed the third note.  Each of the

seven guaranties for the third note was in the amount of $21,500.  (Docket Entry No. 58, Ex.

A at 5; *Id.*, Exs. A17- A21).  With the exception of LaMarra, the partners who guaranteed the

first two notes executed new guaranty agreements when the first two notes were modified.

(*Id.*, Ex. A at 5).  LaMarra's most recent guaranty agreement was executed on August 30,

---

[5]LaMarra's most recent guaranties use slightly different language: "AMOUNT OF GUARANTY. The principal amount of this Guaranty is [Y] Dollars ($[Y])." Docket Entry Nos. 14, 15, 16).  This difference in the language used in the governing guaranties is presumably due to the fact that LaMarra was the only partner who refused to execute new guaranty agreements when  the first two notes were modified on November 30, 2005.

2005, after the first modification of the first note on January 26, 2005, but before the first modification of the second note and the second modification of the first note, both of which occurred on November 30, 2005. (*Id.*, Ex. A16).

On April 13, 2006, Whitney Bank notified Medical Plaza and the guarantors that the notes were unpaid and demanded payment. (*Id.*, Ex. A at 6). Medical Plaza and the guarantors have failed to pay the amounts due. (*Id.*). Whitney Bank owns and holds the notes and guaranties. (*Id.*).

After this suit was filed, LaMarra asserted the defense of mutual mistake. (Docket Entry Nos. 4, 62). Bui and Guajardo did not plead the defense but raised it in response to Whitney Bank's summary judgment motion. (Docket Entry Nos. 28, 30, 64). These guarantors assert that although they signed agreements guarantying 150% of their ownership interest shown in the June 2004 ownership list, up to a dollar amount equal to that percentage, this was not what the parties intended. Instead, they assert that the parties intended the amount guaranteed to be limited to 150% of their actual ownership interests in Medical Plaza. (Docket Entry No. 62 at 6-7; Docket Entry No. 64 at 6-9). LaMarra, Bui, and Guajardo assert that all of the partners did not in fact purchase all the interests they had initially committed to buy, which are the interests shown in the June 2004 ownership list. (*Id.*). As a result, through the mutual mistake of the parties the guaranties were based on 150% of the ownership interest the partners committed to buy, not the interest they actually ended up owning. (*Id.*).

LaMarra has submitted an affidavit from an accountant for Medical Plaza, Dorothy Pearce. (Docket Entry No. 63, Ex. D). She provides information on the actual capital

6

contributions of the partners based on the partnership's accounting records. (*Id.*). Mann, Guajardo, and LaMarra contributed less than the amounts outlined in the ownership list, while Sanchez contributed more. (*Id.*). Janowitz initially contributed more than the amount outlined in the ownership list, but the excess contribution was apparently later refunded. (*Id.*).

LaMarra had committed to purchase three units for $45,000, representing a 12.75% ownership interest in Medical Plaza. This commitment was reflected in the June 2004 ownership list that Whitney Bank received, which the parties used in calculating the guaranty amounts. LaMarra signed guaranty agreements that calculated his guaranty obligation at 150% of the amount corresponding to ownership of three units, or a 12.75% ownership interest. The guaranty agreements limited the specific dollar amount of the guaranty obligation to an amount corresponding to 150% of the 12.75% ownership interest. LaMarra did not in fact purchase three units. (Docket Entry No. 58, Ex. F). Instead, in January 2005, after he signed the first guaranty agreement in June 2004 and before he signed the February 2005 and August 2005 guaranty agreements, LaMarra asked to have his ownership units reduced from three to two units. (*Id.*). LaMarra at that point had paid Medical Plaza $22,500 and still owed $7,500.00 for two units. (*Id.*). LaMarra did not pay the remaining $7,500.00. (Docket Entry No. 63, Ex. D).

LaMarra asserts that the proper amount of his guaranty should be calculated based on 150% of the average of his "actual ownership percentages" during two different time periods. (Docket Entry No. 62 at 5). He calculates that the amount of his guaranty should be 150% of 6.22%, not 12.75%. (*Id.*). He argues that the higher amount shown in the guaranty

agreements he signed for the first two notes results from the parties' mutual mistake of basing the amounts on the ownership interest that he and other investors committed to purchase rather than their actual investment.

Similarly, Bui and Guajardo assert that their guaranty amounts for the first two notes should not have been based on 150% of their ownership interests shown in the ownership list provided to Whitney Bank in June 2004.  (Docket Entry No. 64).  These interests were 12.75% for Bui and 8.5% for Guajardo.  (Docket Entry No. 58, Ex. A25).  Bui asserts that his interest should have been no more than 12.44%, not 12.75%, and the guaranty calculated as 150% of that interest. (Docket Entry No. 64 at 5).  Bui actually purchased the ownership interest units he committed to buy.  His argument that he owes a lower guaranty amount is not based on his purchasing fewer units than he committed to purchase, but on the fact that other investors made different capital contributions than were shown in the June 2004 ownership list.  The different contributions made by other investors resulted in Bui owning a slightly reduced ownership percentage.  (Docket Entry No. 63, Ex. D).

Guajardo did not buy two units for $30,000.00, as he committed, but instead contributed $15,000.  (*Id*.).  He asserts that he actually owns 4.15% of the partnership, not 8.5%, and that his guaranty obligation should be calculated based on 150% of that interest.  (Docket Entry No. 64 at 5).  Like LaMarra, Bui and Guajuardo assert that their intent was to guaranty 150% of the actual ownership interest of each guarantor, not the amounts shown in the June 2004 ownership list.  (*Id*.).

Whitney Bank disputes that LaMarra, Bui and Guajardo have identified or submitted evidence that raises a fact issue as to the defense of mutual mistake.  Whitney Bank asserts that it intended that the doctors and managers would guaranty 150% of the total debt owed to the Bank and that the individual guaranty amounts would be based on the ownership percentages provided to Whitney Bank at the beginning of the lending relationship, which were in turn based on the investors' subscription and partnership agreements.  (Docket Entry No. 67 at 2).  Whitney Bank argues that there is no evidence that it intended to have the guaranty amounts fluctuate over time to reflect the actual contributions that were made after some investors defaulted on their commitments.  (*Id.*).

The arguments and record are examined below.

## II.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact."  *Lincoln General Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element or claim.  *Celotex*, 477 U.S. at 330.  The party moving for summary

9

judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *Bourdeaux v. Swift Transp. Co., Inc.,* 402 F.3d 536, 540 (5th Cir. 2005). "An issue is material if its resolution could affect the outcome of the action." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 535 (5th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004). This burden is not satisfied by "some metaphysical doubt as to the material facts," "conclusory allegations," "unsubstantiated assertions," or "only a scintilla of evidence." *Young v. Exxonmobil Corp.*, 155 Fed. Appx. 798, 800 (5th Cir. 2005).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255; *Young*, 155 Fed. Appx. at 800. "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial.'"  *Beard v. Banks*, 126 S.Ct. 2572, 2578 (2006) (quoting *Celotex*, 477 U.S. at 322).

**III.   Analysis**

To recover on a promissory note under Texas law, "the plaintiff must prove: (1) the note in question, (2) the party sued signed the note, (3) the plaintiff is the owner or holder of the note, and (4) a certain balance is due and owing on the note." *Graf v. Sheffield Capital Corp.*, No. 05-99-01958-CV., 2001 WL 328676, at *5 (Tex. App.-Dallas April 5, 2001,  no pet.); *see also Cadle Co. v. Bankston & Lobingier*, 868 S.W.2d 918, 921 (Tex. App.- Fort Worth 1994, writ denied) (the plaintiff must show "the note was executed by the defendant, the plaintiff is the present holder of the note, and the note has been introduced into evidence."). "To recover on a note through a guaranty, the plaintiff must show: (1) the existence of the note and guaranty; (2) the debtor signed the guaranty; (3) the plaintiff legally owned or held the guaranty; and (4) that a certain balance remains due and owing." *Vaughn v. DAP Financial Services, Inc.*, 982 S.W.2d 1, 4 (Tex. App.-Houston [1st Dist.] 1997, no pet.).  Whitney Bank has presented undisputed evidence of the notes and guaranties and their execution by the defendants; that Whitney Bank owns and holds the notes and guaranties; and that  there is an outstanding balance.  (Docket Entry No. 58, Ex. A; *Id.*, Exs. A1-A21).

The defendants' mutual mistake claim is based on the argument that the parties intended the guaranty agreements for the first two promissory notes to guaranty 150% of each partner's actual ownership interest.  The guaranty agreements calculated the guaranty amounts using the ownership interest commitments shown in the June 2004 ownership list, even if the

11

guarantors had not purchased what they had committed to.  (Docket Entry No. 62 at 6-7; Docket Entry No. 64 at 6-8).  In some cases, the amounts that the guarantors committed to invest differed from the amounts they ended up investing.  (Docket Entry No. 58, Ex. A25; Docket Entry No. 63, Ex. D).  Whitney Bank disputes that the parties intended to have the amounts of the guaranties change as the amount of the actual ownership interests changed and argues that the guaranty agreements were intentionally written to base each guarantor's guaranty amount on the fixed ownership percentages that Medical Plaza provided to Whitney Bank in June 2004.  (Docket Entry No. 67 at 2).

        "Under Texas law, when parties to an agreement have contracted under a mutual misconception of material fact, the agreement is voidable under the doctrine of mutual mistake."  *Smith v. Lagerstam*, No. 03-05-00275-CV, 2007 WL 2066298, at *4 (Tex. App.-Austin July 19, 2007, no pet.) (citing *Williams v. Glash*, 789 S.W.2d 261, 264 (Tex.1990)).  "[A] party must show that there exists (1) a mistake of fact, (2) held mutually by the parties, (3) which materially affects the agreed upon exchange."  *Smith*, 2007 WL 2066298, at *4.  A mistake is "material" if it concerns an issue that is "essential to an understanding of the consequences of an agreement."  *Monet v. Pera*, 877 S.W.2d 352, 357 (Tex. App.-Dallas 1994, no writ) (internal quotations omitted).  "Mutual mistake of fact occurs where the parties to an agreement have a common intention, but the written instrument does not reflect the intention of the parties due to a mutual mistake."  *Gutierrez v. MBank the Woodlands*, 761 S.W.2d 853, 856 (Tex. App.-Beaumont 1988, no writ).  In determining the intent of the parties to a written contract, a court may consider "the conduct of the parties and the information

12

available to them at the time of signing" in addition to the written agreement itself.  *Williams v. Glash*, 789 S.W.2d 261, 264 (Tex. 1990).  A party may introduce parol evidence to show that "an agreement does not express the real intention of the parties."  *Marcuz v. Marcuz*, 857 S.W.2d 623, 627 (Tex. App.-Houston [1st Dist.] 1993, no writ).

Mutual mistake is an affirmative defense that must be pleaded or it is waived.  *See Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir. 1999) ("The Federal Rules require an affirmative defense to be pleaded; failure to plead such a defense constitutes waiver").  Bui and Guajardo failed to plead mutual mistake of fact in their answers.  (Docket Entry No. 28, 30).  They waived the affirmative defense.  But because the mutual mistake defense is analyzed on the merits as to LaMarra, in the interest of completeness, it is also analyzed as to Bui and Guajardo.

LaMarra, Guajardo, and Bui claim that the parties intended each partner to execute guaranties for the first two notes that were proportional to that partner's actual ownership interest in the partnership.  (Docket Entry No. 62 at 6-7, Docket Entry No. 64 at 6-8).  LaMarra, Guajardo, and Bui agree that the parties intended to have the guarantors guaranty 150% of Medical Plaza's indebtedness to Whitney Bank.  Each guaranty agreement sets out a maximum guaranty amount of 150% of that portion of Medical Plaza's debt that corresponds to each doctor's ownership interest, as shown in the June 2004 ownership list.  These defendants argue that the mutual mistake was in calculating the guaranty amounts based on the ownership interests set out in the June 2004 ownership list, rather than the actual ownership interests held.  (*Id.*).  To support this claim, LaMarra, Guajardo, and Bui provide

13

affidavits in which they testify that they and Whitney Bank intended to execute guaranties for amounts based on 150% of each partner's actual ownership interest in Medical Plaza, not the interests that the investors had committed to purchase as of June 2004.  (Docket Entry No. 63, Ex. A; Docket Entry No. 65, Exs. A, B).  This evidence is insufficient to raise a fact issue as to mutual mistake of fact.

Whitney Bank has presented competent evidence that it intended the amount of each partner's guaranty to be fixed at 150% of that partner's ownership interest as reflected in the ownership list provided to the Bank at the inception of the lending relationship, and that the sums in the guaranty agreements correctly reflect this amount for each partner.  (Docket Entry No. 67 at 7; Docket Entry No. 58, Ex. A at 6).  There is no evidence that Whitney Bank had the intent that these defendants assert.  To the contrary, the objective evidence of the parties' intent shows that the amount of the guaranties would be based on the ownership interest percentages as they existed in June 2004.  There is no evidence that the parties intended the guaranty amounts to fluctuate if the capital contributions of the individual partners changed over time.  The guaranty agreements state the guaranty amounts as limited to a fixed specific dollar amount.  There is no language providing for recalculating the guaranty amounts if the guarantor's ownership interest decreased or if the ownership interest of other investors changed.  (Docket Entry No. 58, Exs. A4-A21).  The language of the guaranty agreements is consistent with Whitney Bank's competent summary judgment evidence that it intended the guaranty amounts to be proportional to each guarantor's interest as shown in the subscription

agreements and the June 2004 ownership list, not to change if and as the partners' actual capital commitments changed over time.  (Docket Entry No. 58, Ex. A at 6).

Recalculating the guaranty amounts as these defendants assert the parties intended is inconsistent with the parties' undisputed intent to have the guarantors guaranty 150% of Medical Plaza's total debt to Whitney Bank.  The defendants argue that their guaranty amounts must be reduced because they were calculated on the basis of a commitment to purchase a higher ownership interest than they actually bought.  But if the reduction they seek was made for just their guaranties and not for others, because of the dollar limit in the guaranties, Whitney Bank's total debt would not be guaranteed at 150%, as the parties clearly intended.

None of the loan documents show that the guaranty amounts would be based on the "actual capital contributions" made by the partners or that the amounts would fluctuate based on any changes in the actual capital contributions made by the partners.  The defendants are arguing that their failure to fulfill their original financial commitments to Medical Plaza should alter or modify their guaranty obligations to Whitney Bank, but no document suggests any such intent.  To the contrary, the documents are clear that the guaranties were for a specific dollar amount, not an amount that would change over time depending on changes in the investors' capital contributions.

In a similar case dealing with the same defendants and a very similar fact pattern, another court in the Southern District of Texas recently rejected the mutual mistake of fact defense for the same reason.  *See Hitachi Capital Am. Corp. v. Med. Plaza Surgical Ctr.*

15

*L.L.P., et al.*, Civil Action No. 06-1959, at 14-15 (S.D. Tex. Sept. 26, 2007).  There is no language in the guaranty agreements adjusting the guaranty amount based on any change in ownership interest.  The purpose of the mutual mistake doctrine is not to allow parties "to avoid the results of an unhappy bargain."  *Williams v. Glash*, 789 S.W.2d 261, 265 (Tex. 1990).  The mutual mistake defense fails as a matter of law.

Whitney Bank's motion for summary judgment is granted.

## IV.   Damages

Whitney Bank submitted evidence of the principal and interest owed by Medical Plaza under the notes as of August 17, 2007, taking into account settlements with two of the guarantors.  The amounts are as follows:

**First Note**

| | |
|---|---:|
| Principal at Default | $925,000.00 |
| Mann Settlement Proceeds Applied to Principal | - 98,281.25 |
| Mann Settlement Proceeds Applied to Interest | - 2,967.01 |
| Janowitz Settlement Proceeds Applied to Principal | - 102,561.09 |
| Janowitz Settlement Proceeds Applied to Interest | - 16,143.88 |
| Current Principal Balance | $724,157.66 |
| Current Interest as of August 17, 2007 | $118,377.06 |
| Principal and Interest Due as of August 17, 2007 | $842,534.72 |
| Interest Rate: 9.75% (Per Diem Interest:$196.13) | |

**Second Note**

| | |
|---|---:|
| Principal at Default | $369,221.82 |
| Mann Settlement Proceeds Applied to Principal | - 39,224.82 |
| Mann Settlement Proceeds Applied to Interest | - 1,288.05 |
| Janowitz Settlement Proceeds Applied to Principal | - 40,786.37 |
| Janowitz Settlement Proceeds Applied to Interest | - 6,529.60 |
| Current Principal Balance | $289,210.63 |
| Current Interest as of August 17, 2007 | $48,038.27 |
| Principal and Interest Due as of August 17, 2007 | $337,248.90 |
| Interest Rate: 9.75% (Per Diem Interest: $78.33) | |

**Third Note**

| | Principal at Default | $100,000.00 |
|---|---|---|

Principal at Default — $100,000.00
Janowitz Settlement Proceeds Applied to Principal — - 18,855.50
Janowitz Settlement Proceeds Applied to Interest — - 1,857.50
Current Principal Balance — $81,144.50
Current Interest as of August 17, 2007 — $12,968.97
Principal and Interest Due as of August 17, 2007 — $94,113.47
Interest Rate: 9.75% (Per Diem Interest: $19.72)

(Docket Entry No. 58, Ex. A at 6-8).

The guaranty obligations on the first and second notes are as follows:

| | Guaranteed Principal Amount[6] | Guaranteed Interest as of August 17, 2007 | Guaranteed Principal and Interest as of August 17, 2007 | Per Diem Interest |
|---|---|---|---|---|
| Andress | $291,199.91 | $42,720.97 | $333,920.88 | $78.87 |
| Bui | $247,519.92 | $36,312.83 | $283,832.75 | $67.04 |
| Crouse | $330,026.56 | $48,417.11 | $378,443.67 | $89.38 |
| Kirby | $291,199.91 | $42,720.97 | $333,920.88 | $78.87 |
| Guajardo | $165,013.28 | $24,208.55 | $189,221.83 | $44.69 |
| LaMarra | $247,519.92 | $36,312.83 | $283,832.75 | $67.04 |

(Docket Entry No. 58, Ex. A at 8).

For the third note, Andress, Bui, Crouse, Guajardo, and Kirby each guaranteed the principal amount for $21,500 and $2,118 in accrued interest (at a rate of $3.47 per diem) for a combined guaranteed amount of $23,618.01 as of August 17, 2007.  (Docket Entry No. 58, Ex. A at 8).

[6]The guaranteed principal amounts are slightly lower than the maximum amounts in the guaranties because a payment was applied to the principal of the second note prior to default.

17

The total amount of debt owed to Whitney Bank by Medical Plaza as of August 17, 2007 is $1,273,897.00.  The guarantors owe the following amounts:

| | |
|---|---|
| Andress | $357,538.89 |
| Bui | $307,450.76 |
| Crouse | $402,061.68 |
| Guajardo | $212,839.84 |
| Kirby | $357,538,89 |
| LaMarra | $283,832.75 |

Whitney Bank also seeks prejudgment interest, postjudgment interest, and attorneys' fees.  The notes and guaranty agreements provide that Medical Plaza and the guarantors will pay reasonable attorneys' fees and expenses incurred by Whitney Bank in enforcing the obligations set out in the notes and guaranty agreements.   (Docket Entry No. 58, Exs. A1-A21).

**V.      Conclusion**

Whitney Bank's motion for summary judgment is granted.  A status conference will be held on **November 13, 2007, at 10:30 a.m.**  The topics will include the status of Bui's and Guajardo's crossclaims and Whitney Bank's claim for attorneys' fees and for prejudgment interest.

SIGNED on October 25, 2007, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

18